DEBRA ODOM,                          :
      Plaintiff,               :
                                   :
v.                                   :
                                   :
GILBERT J. MATTEO, MURRAY            :          CIVIL ACTION NO.
PENDLETON, and CITY OF               :          3:08-cv-1569 (VLB)
WATERFORD,                           :
      Defendants.              :          January 24, 2011

**MEMORANDUM OF DECISION DENYING DEFENDANT GILBERT MAFFEO'S**
**MOTION FOR SUMMARY JUDGMENT [Doc. #57] AND GRANTING IN PART AND**
**DENYING IN PART DEFENDANTS MURRAY PENDLETON AND TOWN OF**
**WATERFORD'S MOTION FOR SUMMARY JUDGMENT [Doc. #58]**

      The plaintiff, Debra Odom (hereinafter "Plaintiff" or "Odom"), filed this

action for damages against the defendants, Officer Gilbert Maffeo (hereinafter

"Maffeo"),[1] Waterford Chief of Police Murray Pendleton (hereinafter "Pendleton"),

and the Town of Waterford[2] (hereinafter collectively "Defendants"). This case

arises out of Officer Maffeo's use of a Taser on the Plaintiff, who allegedly suffers

from a brain injury, during a traffic stop. Her Amended Complaint asserts a total

of sixteen counts against the Defendants. The Plaintiff brings claims against

Officer Maffeo for negligence (First Count), assault and battery (Third Count),

willful/wanton assault and battery (Fifth Count), violation of 42 U.S.C. § 1983

---

      [1] The Plaintiff's Amended Complaint identifies the defendant as "Gilbert Matteo." His correct name is actually Gilbert Maffeo, and the correct spelling of his name will be used in this Memorandum of Decision.

      [2] The Plaintiff's Amended Complaint identifies the defendant as "City of Waterford." The defendant's proper name, "Town of Waterford," will be used in this Memorandum of Decision.

(Seventh Count), false imprisonment (Ninth Count), and negligent infliction of emotional distress (Eleventh Count). She asserts claims against Chief Pendleton for negligent training and supervision (Thirteenth Count) and violation of 42 U.S.C. § 1983 (Fifteenth Count). Finally, she asserts claims against the Town of Waterford for indemnification pursuant to Connecticut General Statute § 7-465 for the alleged torts of Maffeo and Pendleton (Second, Fourth, Sixth, Eighth, Tenth, Twelfth, Fourteenth, and Sixteenth Counts), violation of 42 U.S.C. § 1983 (Seventh and Fifteenth Counts), and negligent training and supervision (Thirteenth Count). The Court previously dismissed the Seventh Count, asserting violation of 42 U.S.C. § 1983, as against defendant Waterford by Memorandum of Decision dated February 3, 2010. [Doc. #52]. Therefore, the Seventh Count remains pending only as to Maffeo.

Presently pending before the Court are motions for summary judgment filed by Maffeo [Doc. #57], and by Pendleton and Waterford [Doc. #58]. The Defendants seek summary judgment as to all surviving claims asserted in the Amended Complaint. For the reasons stated below, Maffeo's motion for summary judgment is DENIED, and Pendleton and Waterford's motion for summary judgment is GRANTED IN PART and DENIED IN PART.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The following facts relevant to the Defendants' motions for summary judgment are undisputed unless otherwise noted. On September 22, 2006, at approximately 10:30 p.m., Odom was pulled over by Officer Maffeo while

operating her motor vehicle on Route 32 in Waterford, Connecticut. Def. Maffeo's 56(a)(1) Statement ¶ 1. Maffeo was on duty as a Town of Waterford Police Officer at that time and place, and was operating a police cruiser with yellow or white and orange overhead lights. Id. ¶ 2; Odom Aff. ¶ 7. The record does not reflect whether or not Maffeo was dressed in police uniform at the time of the traffic stop. Odom concedes that, while Maffeo was following her on Route 32, she exceeded the posted speed limit and changed lanes without signaling. Def. Maffeo's 56(a)(1) Statement ¶ 3. After following Odom for some distance, Maffeo activated the emergency lights on his police cruiser, and effected a motor vehicle stop on Odom. Id. ¶ 4. When Maffeo approached Odom's vehicle, he requested that she turn off the vehicle and roll down her window. Id. ¶ 5. Odom complied with the request to turn off her vehicle, but rolled her window down only approximately three inches. Id. ¶ 6.

Maffeo claims that he identified himself to Odom as a police officer upon approaching her vehicle. Id. ¶ 7. Odom disputes this claim, contending that she did not know that she was being followed by a police car, could not see who was approaching her car, and that Maffeo did not initially identify himself as a police officer. Pl. 56(a)(2) Statement ¶ 7. Odom asserts that she did not know whether Maffeo's vehicle was a police vehicle because it had yellow or white and orange flashing lights rather than red or blue lights and had been driving erratically. Odom Aff. ¶ 7. She further claims that her ability to see Maffeo was hindered because he shined a bright flashlight in her mirrors when he left his car and

moved his light directly into her eyes when he approached her vehicle. Id. ¶ 10.

According to Maffeo, when he approached Odom's vehicle she immediately told

him that he had to turn off his spotlight because it was blinding her. Maffeo Aff. ¶

10. Odom further indicated that she had a brain injury and that the light could

cause her to have a seizure. Maffeo Aff. ¶ 11. Maffeo responded that he would

turn off the spotlight once he had her license, registration, and insurance card,

and deemed it to be safe to do so. Id.

Odom did not comply with Maffeo's initial investigative request for her

driver's license, registration, and insurance card. Def. Maffeo's 56(a)(1) Statement

¶ 9. Maffeo requested the same information a second time, and again Odom failed

to comply. Id. ¶ 10. Maffeo then requested the information a third time, at which

point Odom provided only her driver's license. Id. ¶ 11. Odom indicates that she

intended to fully comply with Maffeo's request after he identified himself as a

police officer and after she provided him with important information about her

brain injury. Pl. 56(a)(2) Statement ¶¶ 9-11. Odom suffers from a brain injury

which she claims makes it difficult for her to understand and respond to

instructions, makes her appear agitated or uncooperative, and makes her dizzy

and photosensitive. Odom Aff. ¶ 4. She contends that she handed her "brain

injury survivor card" to Maffeo when she gave him her driver's license and asked

him to read it because she suffers from a brain injury. Id. ¶ 19. However, Maffeo

refused to read the information on the card and threw it back at her. Id. ¶ 20. She

attempted to hand it to him again, but he again threw it back at her without

4

reading it.  Id. ¶¶ 21-22.  Maffeo denies this, claiming that he read the card and handed it back to Odom, after which she continued to refuse to provide him with the information he had requested.  Maffeo Aff. ¶¶ 12-13.  The card, which was provided to Odom by a support group sponsored by the Brain Injury Association of Connecticut, identifies Odom as a brain injury survivor, lists her mother as an emergency contact, and describes medication, foods, and substances that she is allergic to.  Def. Maffeo Exh. C.  In addition, the back of the card outlines some of the potential symptoms of brain injury, which may include impairment of vision, hearing, and sense of understanding, impairment of coordination and ability to control muscles, excessive laughing or crying, restlessness, agitation, and anxiety, slow responses, difficulty with short or long term memory, confusion, disorientation, and anger.  Id.  There is no mention of photosensitivity or proneness to seizures.

Odom claims that after she gave Maffeo her license and while she was searching for her registration and insurance card, her cell phone rang.  She answered the phone because she knew from the ring tone that it was her mother calling, and she hoped that her mother could inform Maffeo of the limitations she experienced as a result of her brain injury.  Odom Aff. ¶ 22.  Odom states that after she answered the phone, Maffeo identified himself as a police officer for the first time, but refused to give his name or badge number or identify the municipality he served.  Id. ¶ 23.  She then gave her phone to Maffeo and asked him to speak with her mother.  Id. ¶ 24.

At the time of the traffic stop, Odom had pepper spray, a wooden "tire knocker" club, and a box cutter in her vehicle. Id. ¶ 13. Odom admits that these items were in her vehicle, but asserts that none of the items were in her reach during the stop and that she made no efforts to reach any of the items. Pl. 56(a)(2) Statement ¶ 13. Maffeo claims that, after Odom handed him her cell phone, she returned it and opened her car door, at which time he saw the "tire knocker" club next to her seat. Def. Maffeo's 56(a)(1) Statement ¶ 14. At this point, he became concerned for his safety because of the presence of the club, the secluded area, and Odom's agitated and odd behavior. Maffeo Aff. ¶ 18. He then ordered her to exit the vehicle, but she refused. Id. ¶ 19. Odom contends, however, that Maffeo did not return the cell phone to her, but instead hung up the phone, turned the power off, and threw it on the dashboard. Odom Aff. ¶ 25. Odom further contends that Maffeo started yelling at her, at which point she feared for her safety and tried to turn on her phone to call 911. Id. ¶¶ 26-27. Maffeo purportedly prevented her from doing so by opening her car door from the inside, "leaping" into the car, grabbing the phone, and smashing it against the road. Id. ¶ 28. Odom claims that, during the altercation, Maffeo struck his head against hers, and his glasses or badge cut her shoulder. Id.

Maffeo then told Odom that she was under arrest and ordered her to get out of the car. Maffeo Aff. ¶ 20. According to Odom, she informed Maffeo that she would gladly exit the vehicle at the request of another police officer because she feared for her safety. Pl. 56(a)(2) Statement ¶ 15. Odom explains that she did not

6

believe that Maffeo was a real police officer because of the way he was acting and because he did not identify himself.  Odom Aff. ¶ 29.  When Odom refused to exit the vehicle, Maffeo grasped her with his hands and attempted to forcibly remove her.  Def. Maffeo's 56(a)(1) Statement ¶ 16.  Maffeo contends that he grabbed Odom by the left arm and tried to remove her from the vehicle.  Maffeo Aff. ¶ 20.  Odom claims, however, that Maffeo "dove" into her car, grabbed her by the crotch and neck, and tried to pull her out.  Odom Aff. ¶ 30.  She resisted by grasping the steering wheel and a strap attached to the door frame, and pinning her legs in the driver's compartment.  Def. Maffeo's 56(a)(1) Statement ¶ 16.  Maffeo claims that he then contacted dispatch and asked for an additional unit to assist him.  Maffeo Aff. ¶ 22.  After Maffeo grasped Odom, she began screaming that he was trying to beat and rape her.  Pl. 56(a)(2) Statement ¶ 21.  Maffeo released her when a nearby neighbor came to his balcony.  Odom Aff. ¶ 33.  According to Maffeo, Odom then tried to put her car in drive, at which point he reached into Odom's vehicle and removed her keys from the ignition.  Maffeo Aff. ¶¶ 22-24.  He claims that, as he did so, Odom struck him on the right side of the face, knocking his glasses off.  Maffeo Aff. ¶ 24.  Odom denies this, stating that she never struck, hurt, or physically or verbally threatened Maffeo.  Odom Aff. ¶¶ 42-44.

Maffeo next warned Odom that if she did not exit the vehicle, he would spray her with mace.  Def. Maffeo's 56(a)(1) Statement ¶ 17.  Odom informed Maffeo that she had asthma, and that if he maced her, she "would die."  Maffeo re-holstered his spray without deploying it.  Id. ¶ 18.  Maffeo contends that he then

warned Odom that if she did not exit the vehicle, he would tase her. Id. ¶ 19. After Odom continued to refuse to exit her vehicle, Maffeo fired his Taser, striking her in the thigh area. Id. ¶ 20. He was then able to remove her from the vehicle. Maffeo Aff. ¶ 29. Odom claims, however, that Maffeo did not warn her that she would be tasered, and that she was tasered without warning. Pl. 56(a)(2) Statement ¶ 19. Odom further claims that, after she was tasered the first time, Maffeo ordered her out of the car, but she told him that she could not exit the car because her muscles had contracted as a result of the Taser and she could not move. Odom Aff. ¶ 39. Maffeo then recharged his Taser and shot her two more times without warning. Id. ¶¶ 39-40.

After Maffeo removed Odom from her vehicle, he brought her down to the ground on her knees and ordered her to lie on her stomach. Maffeo Aff. ¶ 30. Odom did not comply, so Maffeo pulled her arms behind her back and placed handcuffs on her. Id. ¶ 31. As Maffeo waited for additional units to arrive, Odom threatened that she was going to have him arrested and sue him. Id. ¶ 32. She also stated that she had refused to listen to him because she had heard of men pretending to be police officers and was afraid, and she simply wanted a female officer present. Id. ¶ 33. A short time later, additional Waterford Police Officers, Sergeant Seymour and Officer O'Connor, arrived at the scene to assist Maffeo. Id. ¶ 34. Sergeant Seymour removed the Taser probes from Odom's legs and they were seized. Id. Odom was arrested and charged with violations of Connecticut General Statutes. Am. Compl. ¶ 25. She was fingerprinted, photographed, and

processed, including being held on $2,500 bond as a result of the criminal charges brought against her by Maffeo.  Id. ¶ 26.

Maffeo sustained injuries during the altercation between himself and Odom, including bruises, lacerations, and a torn labrum - the cuff of cartilage around the shoulder socket - which required surgery and forced him out of work for more than one year.  Def. Maffeo's 56(a)(1) Statement ¶ 22; Maffeo Aff. ¶ 38.  Odom contends, however, that she never struck or hurt Maffeo and that his injuries were not caused by her.  Pl. 56(a)(2) Statement ¶ 22.  Following the incident, members of the Waterford Ambulance Service attended to Odom.  Def. Pendleton and Waterford's 56(a)(1) Statement ¶ 6.  Waterford Ambulance Service personnel took a medical history from Odom, who provided detailed information regarding her medical history, including the fact that she suffered from asthma and had experienced a traumatic brain injury in the past.  Id. ¶ 7; Def. Exh. E.

Odom suffered a brain injury on June 6, 2004 when she was involved in a motor vehicle collision with a tractor-trailer being operated by Eric F. Villano and owned by Werner Enterprises, Inc.  Def. Pendleton and Waterford's 56(a)(1) Statement ¶ 8.  Following the motor vehicle accident on June 6, 2004, Odom was treated by Laurence I. Radin, M.D. of Neurological Group, P.C.  Id. ¶ 11.  Dr. Radin first examined Odom on June 16, 2004, at which time his initial impression was that she suffered from post-concussion syndrome with a normal CT scan.  Id. ¶ 12.  Dr. Radin performed five electroencephalogram studies on Odom between the

dates of June 28, 2004 and June 4, 2007.  Id. ¶ 13.  None of the electroencephalogram studies indicated that Odom had seizure activity.  Id. ¶ 14.

Odom filed suit against Werner Enterprises as a result of the car accident. In her complaint in that case, she alleged that she suffered injuries including a closed head injury with concussion, headaches, confusion, loss of memory and post-concussion syndrome.  Id. ¶ 9.  Dr. Radin was deposed in connection with that lawsuit.  During his testimony, he confirmed that there is no medical evidence that Odom experienced seizure activity.  Id. ¶¶ 15-17, 19.  Dr. Radin further testified that Odom's diagnosis included concussion, mild traumatic brain injury, and excessive sleepiness.  Id. ¶ 18.

Odom has not disclosed any expert witness to testify in this case regarding the nature or effect of her brain injury or any other pre-existing medical condition she had before the incident giving rise to this lawsuit.  Id. ¶ 21.  Nor has she disclosed any expert witness to testify regarding any pre-existing medical condition that rendered her more susceptible to harm from being tasered, or about injuries she sustained as a result of being tasered.  Id. ¶¶ 22-24.  Indeed, apart from her affidavit, Odom has produced no evidence at all regarding the nature of her brain injury.

Odom admitted during her deposition that she has no evidence regarding the nature or adequacy of Maffeo's training, or of Waterford Police policies or procedures as they pertain to use of force in general, or Taser devices specifically.  Def. Maffeo's 56(a)(1) Statement ¶ 23-24.  However, she has filed with

her objection to the instant motions the Waterford Police Department's policy regarding the use of a "less lethal device," which includes Tasers. Pl. Obj. Exh. A. The policy authorizes the use of less lethal devices on persons engaged in "Active Resistance," meaning "actively resisting arrest." Id. at 1. Under the policy, the use of less lethal devices is not authorized on persons "Passively Resisting," which is not defined. Id. The policy includes specific instructions pertaining to use of Tasers. Id. at 2-3. Only personnel specially trained in the use of a Taser are permitted to use one, and Tasers are maintained under the command and control of the shift supervisor on duty, who issues them to officers each day and maintains a daily record of their issuance. Id. at 2. The policy explicitly requires a verbal warning to be given before discharging the Taser:

> In all applications of the Taser, a verbal warning of the weapons impending use should be given, notifying other Officers of the discharge.

> The deploying officer shall announce in a load voice "Taser, Taser, Taser".

Id. at 3. A written report must be completed following any use of a Taser. Id. The policy further provides that the Taser should not be used against a suspect whom the officer knows to be pregnant. Id. No other medical conditions are referenced in the policy.

The Waterford Police Department also has a general "Use of Force" policy which provides that police officers "shall use only that force that appears reasonably necessary to effectively bring an incident under control," in

accordance with Conn. Gen. Stat. § 53a-22.[3]  Def. Pendleton and Waterford's Reply, Exh. 1.  The policy authorizes an officer's use of "reasonable non-deadly force" on another person when he believes it necessary to (1) "Effect an arrest or prevent an escape from custody of a person whom he reasonably believes to have committed an offense, unless he knows that the arrest or custody is unauthorized"; (2) "Defend himself or a third person from the use or imminent use of physical force while effecting or attempting to effect an arrest or while preventing or attempting to prevent an escape"; or (3) "To thwart the acts of another he reasonably believes is about to commit suicide or to inflict serious physical injury upon himself."  Id. at 450 (citing Conn. Gen. Stat. § 53a-22).

Odom filed this action in Connecticut Superior Court on September 18, 2008.  On October 14, 2008, the Defendants removed the case to this Court on the basis of federal question jurisdiction because Odom asserted claims pursuant to 42 U.S.C. § 1983.  [Doc. #1].  On February 17, 2009, Odom filed an Amended

---

[3]    This statute provides, in pertinent part, that a police officer "is justified in using physical force upon another person when and to the extent that he or she reasonably believes such to be necessary to:  (1) Effect an arrest or prevent the escape from custody of a person whom he or she reasonably believes to have committed an offense, unless he or she knows that the arrest or custody is unauthorized; or (2) defend himself or herself or a third person from the use or imminent use of physical force while effecting or attempting to effect an arrest or while preventing or attempting to prevent an escape."  Conn. Gen. Stat. § 53a-22(b).  A "reasonable belief" that a person has committed an offense is defined as "a reasonable belief in facts or circumstances which if true would in law constitute an offense."  Conn. Gen. Stat. § 53a-22(a).  "If the believed facts or circumstances would not in law constitute an offense, an erroneous though not unreasonable belief that the law is otherwise does not render justifiable the use of physical force to make an arrest or to prevent an escape from custody."  Id.

Complaint with permission of the Court. [Doc. #24]. On March 15, 2009, defendants Pendleton and Waterford filed a motion to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6). [Doc. #28]. Defendant Maffeo filed an answer to the Amended Complaint on March 17, 2009. [Doc. #29]. By Memorandum of Decision dated February 3, 2010, the Court granted in part the motion to dismiss and thereby dismissed the Seventh Count, which alleges violation of the Fourth and Fourteenth Amendments, against Waterford only. [Doc. #52]. The motion was denied in all other respects. Id. Subsequently, on May 4, 2010, Maffeo filed his motion for summary judgment as to all counts asserted against him. [Doc. #57]. On the same date, Pendleton and Waterford filed a separate motion for summary judgment as to all counts asserted against them. [Doc. #58]. On May 25, 2010, Odom filed objections to both motions. [Doc. ##64, 65]. Pendleton and Waterford filed a reply on June 6, 2009. [Doc. #67].

## II. STANDARD OF REVIEW

Summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" Bouboulis v. Transp. Workers Union of Am., 442

F.3d 55, 59 (2d Cir. 2006) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).

The moving party bears the burden of showing that no genuine issues exist as to any material facts.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-25 (1986).  If the moving party meets its burden, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor."  <u>Burt Rigid Box, Inc.</u> <u>v. Travelers Prop. Cas. Corp.</u>, 302 F.3d 83, 91 (2d Cir. 2002).  "The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture."  <u>Western World Ins. Co. v. Stack Oil, Inc.</u>, 922 F.2d 118, 121 (2d Cir.1990) (internal quotations and citations omitted).  A party also may not rely on conclusory statements or unsupported allegations that the evidence in support of the motion for summary judgment is not credible.  <u>Ying Jing Gan v. City</u> <u>of New York</u>, 996 F.2d 522, 532 (2d Cir. 1993).

The Court "construe[s] the evidence in the light most favorable to the non-moving party and . . . draw[s] all reasonable inferences in its favor."  <u>Huminski</u> <u>v. Corsones</u>, 396 F.3d 53, 69-70 (2d Cir. 2004).  "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party,

summary judgment must be denied." **Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH**, 446 F.3d 313, 315 (2d Cir. 2006).

### III. DISCUSSION

#### A. Maffeo's Motion for Summary Judgment

##### 1. Reasonableness of Maffeo's Use of Force

Maffeo first argues that he is entitled to summary judgment as to all claims asserted against him because his use of force under the factual circumstances of this case was reasonable as a matter of law. Determining whether the force used by an officer to effect a seizure is "reasonable" under the Fourth Amendment requires "a careful balance of the nature and quality of the individual's Fourth Amendment interest against the countervailing governmental interest at stake." **Graham v. Connor**, 490 U.S. 386, 396 (1989) (citation and quotation marks omitted). The inquiry involves "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." **Id.** Reasonableness is judged from the perspective of a "reasonable officer on the scene," rather than in hindsight, and must consider the fact that officers must often make split second judgments regarding the necessary amount of force in tense, uncertain, and rapidly evolving circumstances. **Id.** at 396-97. Nevertheless, "[g]iven the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no

15

reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." <u>Amnesty America v. Town of West Hartford</u>, 361 F.2d 113, 123 (2d Cir. 2004).

The allegations contained in Odom's affidavit are sufficient to create genuine issues of material fact as to the objective reasonableness of the degree of force used by Maffeo. Based upon Odom's version of the events, she complied with Maffeo's effort to pull her over for minor traffic infractions. She then made several attempts to communicate with Maffeo regarding her brain injury and resulting difficulties in responding to his requests, but he refused to consider this information and became increasingly agitated and aggressive. She informed Maffeo that she would fully comply with his requests in the presence of another officer. She made no attempts to flee the scene, nor did she attempt to strike him or use any threatening words or actions. Nevertheless, Maffeo attempted to remove her from her vehicle by force and then tasered her multiple times without giving a warning. Under these circumstances, a reasonable jury could find that Maffeo's use of force was excessive and unreasonable. Given the competing affidavits submitted by the parties, the jury could construe Odom's conduct as passively resisting Maffeo's requests, or even attempting to comply subject to limitations caused by her brain injury. <u>See</u> <u>Robison v. Via</u>, 821 F.2d 913, 924 (2d Cir. 1987) (finding summary judgment on excessive force claim inappropriate where parties provided conflicting accounts as to whether officer or plaintiff initiated the use of force, how much force was used by each, and whether plaintiff

was reaching for officer's gun). Therefore, the Court cannot find Maffeo's actions clearly reasonable as a matter of law. See, e.g., Amnesty America v. Town of West Hartford, 361 F.3d 113, 123 (2d Cir. 2004) (holding that genuine issues of material fact existed as to whether degree of force used by police officers in arresting anti-abortion protestors was reasonable where plaintiffs' resistance was passive and officers' uses of force included lifting and pulling protestor by pressing their wrists against their forearms in a manner that caused lasting damage, throwing a plaintiff face-down to the ground, dragging a plaintiff face-down by the legs, causing a second-degree burn on his chest, placing a knee on a plaintiff's neck in order to tighten his handcuffs while he was lying face-down, and ramming a plaintiff's head into a wall at a high speed); Robison, 821 F.2d at 923-24 (holding that genuine issues of material fact existed as to whether degree of force used by officer was excessive where officer pushed plaintiff against the inside door of her car, yanked her out, threw her up against the fender, and twisted her arm behind her back, even though plaintiff did not seek medical treatment for her injuries).

Maffeo argues that his use of force was reasonable because he was using force to effectuate an arrest of Odom for committing traffic infractions, namely failure to signal in violation of Conn. Gen. Stat. § 14-242 and traveling unreasonably fast in violation of Conn. Gen. Stat. § 14-218a, as well as for refusing to produce her driver's license, registration, and proof of insurance in violation of Conn. Gen. Stat. § 14-217, which is also an infraction. Although

Maffeo does claim that he feared for his safety when he observed the tire knocker club in Odom's vehicle, if the facts asserted by Odom are true - namely that the items found in her vehicle were not within her reach - a reasonable jury could find that Maffeo's use of force was not justified given the lack of severity of the offenses she committed. As one Court has explained, "[t]raffic violations generally will not support the use of a significant level of force." <u>Bryan v. MacPherson</u>, - F.3d -, 2010 WL 4925422, at *19 (9th Cir. Nov. 30, 2010); <u>see also Deville v. Marcantel</u>, 567 F.3d 156, 167 (5th Cir. 2009) ("Deville was stopped for a minor traffic violation . . . making the need for force substantially lower than if she had been suspected of a serious crime."). Indeed, under Connecticut law as well as Waterford Police Department policy, the use of force is not authorized to effect an arrest for an infraction. Conn. Stat. Stat. § 53a-22 provides that a police officer:

> is justified in using physical force upon another person when and to the extent that he or she reasonably believes such to be necessary to: (1) Effect an arrest or prevent the escape from custody of a person whom he or she reasonably believes to have committed an offense, unless he or she knows that the arrest or custody is unauthorized; or (2) defend himself or herself or a third person from the use or imminent use of physical force while effecting or attempting to effect an arrest or while preventing or attempting to prevent an escape.

In turn, the statutory definition of "offense" expressly excludes motor vehicle violations and infractions:

> The term "offense" means any crime or violation which constitutes a breach of any law of this state or any other state, federal law or local law or ordinance of a political subdivision of this state, for which a sentence to a term of imprisonment or to a fine, or both, may be imposed *except one that defines a motor vehicle violation or is deemed to be an infraction*.

Conn. Gen. Stat. § 53a-24(a) (emphasis added).  The Waterford Police Department's "Use of Force" policy adopts the criteria governing appropriate use of force set forth in Conn. Gen. Stat. § 53a-22.  <u>See</u> Def. Pendleton and Waterford's Reply, Exh. 1.  Here, since Odom did not commit an "offense" as that term is defined under the penal code, his initial use of force to attempt to remove her from her vehicle was not justified.  Further, based upon Odom's version of the facts, she did not strike or threaten Maffeo either physically or verbally, and therefore Maffeo was not justified in using force to defend himself.

Maffeo further argues that his use of force was justified because Odom resisted his attempts to investigate traffic infractions and to arrest her in violation of Conn. Gen. Stat. § 53a-23 and Conn. Gen. Stat. § 53a-167, which is a misdemeanor.  This argument is also unavailing.  As an initial matter, as explained above, there is a material dispute as to whether Maffeo was justified in attempting to forcibly remove Odom from her vehicle and place her under arrest in the first place because she had committed only minor infractions, and not an "offense" as defined by Connecticut law.  Furthermore, even had Maffeo been justified in his initial use of force, a reasonable jury could conclude that his subsequent Taser deployment on a purportedly non-threatening individual who was not attempting to escape and had conveyed to Maffeo that she suffered from a brain injury was unreasonable.  <u>See</u>, <u>e.g.</u>, <u>Bryan v. MacPherson</u>, - F.3d -, 2010 WL 4925422, at *1 (9th Cir. Nov. 30, 2010) (finding it unreasonable to use Taser against a suspect who was unarmed, made no threatening statements or

gestures, and did not resist arrest or attempt to flee); Brown v. City of Golden Valley, 574 F.3d 491, 497 (8th Cir. 2009) (denying summary judgment for officer who used Taser against a suspect who was not armed and did not actively resist arrest or attempt to flee); Casey v. City of Federal Heights, 509 F.3d 1278, 1282 (10th Cir. 2007) (finding it unreasonable to use a Taser against a "nonviolent misdemeanant who was neither dangerous nor fleeing"). This conclusion is further supported by the fact that, based upon Odom's version of events, Maffeo tasered her not once, but three times, each time without warning. See, e.g., Towsley v. Frank, No. 5:09-cv-23, 2010 WL 5394837, at *10 (D. Vt. Dec. 28, 2010) (holding that, even though officer was justified in tasing plaintiff initially, material facts precluded summary judgment on the second tasing because plaintiff presented evidence that he was not attempting to escape after the first Taser deployment).

If the facts asserted by Odom are true, Maffeo's actions also violated Waterford Police Department policy governing the use of Tasers. Under Department policy, a Taser may be deployed only on a subject who is "actively resisting arrest," not one is who engaged merely in "passive resistance" as Odom contends she was doing in this case. Pl. Obj. Exh. A. Further, the policy requires an officer to give warning before deploying a Taser, which Odom claims Maffeo did not do. Id. In sum, the use of a Taser is a significant use of force, and a reasonable jury could well find that its repeated deployment on an individual who is suspected of only minor traffic infractions, poses no immediate threat, is not

attempting to escape, and has indicated that she suffers from a brain injury constitutes an excessive and unreasonable use of force.  See Bryan, 2010 WL 4925422, at *2 (describing use of a Taser as an "intermediate, significant level of force that must be justified by the governmental interest involved"); see also Oliver v. Florino, 586 F.3d 898, 903 (11th Cir. 2009) (recognizing that a Taser is "designed to cause significant, uncontrollable muscle contractions").  Based upon Odom's version of the events, Maffeo had less onerous, alternative means available for dealing with the situation.  For instance, he could have called for and awaited the arrival of backup officers to assist in bringing the situation under control, as Odom was purportedly not fleeing, threatening, or violent.

## 2.  Violation of 42 U.S.C. § 1983

Maffeo next argues that he is entitled to summary judgment on the Seventh Count, in which Odom asserts a 42 U.S.C. § 1983 claim for the deprivation of constitutional rights as a result of Maffeo's unreasonable use of force against her. Maffeo cites the Second Circuit's decision in Curley v. Village of Suffern, 268 F.3d 65, 72 (2d Cir. 2001), for the proposition that when claims against a municipality are dismissed, claims against police officers in their official capacities should be dismissed as well.  Thus, Maffeo contends, this Court's previous dismissal of the Seventh Count as against Waterford should also operate as a dismissal of the Seventh Count as to him because the Amended Complaint asserts a 42 U.S.C. § 1983 claim against him in his official capacity only.  In the Court's earlier Memorandum of Decision on Defendant Pendleton and Waterford's Motion to

Dismiss, the Seventh Count was dismissed as against Waterford on the basis of Monell v. Dep't of Social Services, 436 U.S. 658 (1978), wherein the Supreme Court held that a municipality cannot be held liable under 42 U.S.C. § 1983 for a constitutional violation committed by its employees unless the violation was caused by the enforcement of a municipal policy, practice, or decision of a final municipal policy maker. See Odom v. Matteo, No. 3:08-cv-1569(VLB), 2010 WL 466000, at *2-3 (D. Conn. Feb. 3, 2010). The Court found that Maffeo was not a final policymaker with respect to police conduct, and therefore Waterford cannot be held liable under 42 U.S.C. § 1983 for his discretionary actions.

Resolution of Maffeo's argument requires the Court to determine whether the 42 U.S.C. § 1983 claim is asserted against him in his personal capacity or his official capacity. The Supreme Court explained the distinction between personal (or individual) capacity suits and official capacity suits in Kentucky v. Graham, 473 U.S. 159, 165 (1985). "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law." Id. To establish personal liability in a 42 U.S.C. § 1983 action, "it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." Id. at 166; see also Bauer v. City of Hartford, No. 3:07-cv-1375(PCD), 2010 WL 4429697, at *6 (D. Conn. Oct. 29, 2010) ("Government officials are subject to suit in their individual capacities for violations of constitutional rights committed in the course of their employment."). By contrast, official capacity suits "generally represent only another way of pleading an action against

an entity of which an officer is an agent." Id. at 165 (citation omitted). Therefore, "[a]s long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." Id. at 166. A government entity is liable under 42 U.S.C. § 1983 only when the entity itself is the "moving force" behind the deprivation. Id. There is no limitation on the ability of a plaintiff to sue an official in both his individual and official capacity. See Kendrick v. Town of Winchester/City of Winsted, 11 F. Supp. 2d 212, 216 (D. Conn. 1998).

Because an official capacity claim against an official is tantamount to a claim against a governmental entity, when a complaint asserts a 42 U.S.C. § 1983 claim against both a municipal entity and a municipal official in his official capacity, the official capacity claim should be dismissed as duplicative or redundant. See Curley, 268 F.3d at 72 (holding that, where claims against a municipality were dismissed, claim against police officers in their official capacity was also properly dismissed because it was essentially a claim against the municipality); Baines v. Masiello, 288 F. Supp. 2d 376, 384-85 (W.D.N.Y. 2003) (dismissing claims against municipal officers as duplicative of claims against the municipality itself). "Where . . . doubt may exist as to whether an official is sued personally, in his official capacity, or in both capacities, the course of proceedings ordinarily resolves the nature of the liability sought to be imposed." Rodriguez v. Phillips, 66 F.3d 470, 482 (2d Cir. 1995); see also Yorktown Med. Lab., Inc. v. Perales, 948 F.2d 84, 88-89 (2d Cir. 1991) (noting that courts must "look to

the totality of the complaint as well as the course of proceedings to determine whether the defendants were provided with sufficient notice of potential exposure to personal liability").

Here, the Amended Complaint does not expressly state in which capacity Maffeo is being sued.  The Amended Complaint does, however, identify Maffeo as a duly appointed police officer for the Waterford Police Department "acting in his official capacity" at all times relevant to this action.  [Doc. #23-2 ¶¶ 4-5].  This indicates an intent to sue Maffeo in his official capacity, although it is not dispositive.  See Soto v. Schembri, 960 F. Supp. 751, 755 (S.D.N.Y. 1997).  On the other hand, the Amended Complaint seeks punitive damages, which, as is well established, cannot be recovered from a municipality.  See City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981).  Courts have held that assertion of a claim for punitive damages is an indicator that the claim was brought against an official in his personal capacity.  See, e.g., Yorktown Med. Lab., 948 F.2d at 88-89; Jessamy v. City of New Rochelle, 292 F. Supp. 2d 498, 508-09 (S.D.N.Y. 2003).  In addition, the Amended Complaint names Waterford as a separate defendant, which would have been unnecessary had Odom sought to file only an official capacity suit against Maffeo.  See Jessamy, 292 F. Supp. 2d at 508-09.  Further, the Seventh Count alleges specific actions taken by Maffeo which she claims violated her constitutional rights.  See Shire v. Grenier, No. 02 Civ. 6061(GBD), 2007 WL 840472, at *10 (S.D.N.Y. Mar. 15, 2007).  Finally, the Amended Complaint asserts indemnification claims against Waterford pursuant to Conn. Gen. Stat. §

7-465 for the wrongful acts of Maffeo.  This statute imposes a duty upon the municipality to indemnify employees for their tortious acts, provided that the employee's actions do not fall within an exception for willful and wanton acts. See Myers v. City of Hartford, 84 Conn. App. 395, 400 (2004).  Had Odom intended to assert only an official capacity claim against Maffeo, her claims against Waterford for indemnification would have been superfluous.  Therefore, based upon the totality of the complaint and the course of the proceedings, and "mindful that . . . complaints must be viewed broadly in the context of civil rights actions," Jessamy, 292 F. Supp. 2d at 508, the Court concludes that Maffeo was adequately on notice that he was being sued in his personal as well as official capacity. Summary judgment is denied as to Odom's 42 U.S.C. § 1983 claim against Maffeo in his personal capacity.

### 3. Negligence

In addition, Maffeo argues that summary judgment must be entered in his favor as to the First Count, which asserts a claim for negligence, and the Eleventh Count, which asserts a claim for negligent infliction of emotional distress, on the basis of governmental immunity.

"The [common-law] doctrines that determine the tort liability of municipal employees are well established . . . .  Generally, a municipal employee is liable for the misperformance of ministerial acts, but has a qualified immunity in the performance of governmental acts . . . .  Governmental acts are performed wholly for the direct benefit of the public and are supervisory or discretionary in nature.

The hallmark of a discretionary act is that it requires the exercise of judgment.  In contrast, [m]inisterial refers to a duty which is to be performed in a prescribed manner without the exercise of judgment or discretion."  <u>Martel v. Metropolitan District Comm'n</u>, 275 Conn. 38, 48-49 (2005) (internal citations and quotation marks omitted).

"Municipal officials are immune from liability for negligence arising out of their discretionary acts in part because of the danger that a more expansive exposure to liability would cramp the exercise of official discretion beyond the limits desirable in our society.  Discretionary act immunity reflects a value judgment that - despite injury to a member of the public - the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury.  In contrast, municipal officers are not immune from liability for negligence arising out of their ministerial acts, defined as acts to be performed in a prescribed manner without the exercise of judgment or discretion.  This is because society has no analogous interest in permitting municipal officers to exercise judgment in the performance of ministerial acts."  <u>Doe v. Peterson</u>, 279 Conn. 607, 614-15 (2006) (internal citations and quotation marks omitted).

When a municipal employee's actions are discretionary in nature, governmental immunity attaches unless one of the following three exceptions applies.  "First, liability may be imposed for a discretionary act when the alleged

conduct involves malice, wantonness or intent to injure.  Second, liability may be imposed for a discretionary act when a statute provides for a cause of action against a municipality or municipal official for failure to enforce certain laws. Third, liability may be imposed when the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm . . . ."  Peterson, 279 Conn. at 615-16 (internal citations and quotation marks omitted).

In its Memorandum of Decision on Defendant Pendleton and Waterford's Motion to Dismiss, which was rendered at a time when the Waterford Police Department's policy regarding less lethal devices was not part of the record, this Court concluded that Maffeo's actions were discretionary in nature.  See Odom, 2010 WL 466000, at *3.  After reviewing the "less lethal devices" policy, however, the Court now finds that genuine issues of material fact exist regarding whether Maffeo was negligent in the performance of any ministerial acts.  "[T]he determination of whether official acts or omissions are ministerial or discretionary is normally a question of fact for the fact finder[.]"  Lombard v. Edward J. Peters, Jr., P.C., 252 Conn. 623, 628 (2000).  "A ministerial duty on the part of an official often follows a quasi-judicial determination by that official as to the existence of a state of facts.  Although the determination itself involves the exercise of judgment, and therefore is not a ministerial act, the duty of giving effect, by taking appropriate action, to the determination is often ministerial."  Pluhowsky v. New Haven, 151 Conn. 337, 347-48 (1964).  Here, the policy explicitly forbids the use of

less lethal devices, including Tasers, on persons who are "passively resisting" as opposed to "actively resisting." Pl. Obj. Exh. A at 1. The policy also requires that officers give a verbal warning before discharging a Taser. Id. at 3. According to Odom's version of the facts, Maffeo shot her with his Taser even though she was passively resisting and without giving a warning, and therefore he violated the less lethal devices policy. Where an officer violates police policy or procedure and those violations do not involve the use of the officer's discretion, the officer is not entitled to immunity and may be held liable for negligently performing ministerial acts. See, e.g., Sciuto v. State, No. CV 950322569S, 1999 WL 1320466, at *2 (Conn. Super. Ct. Dec. 23, 1999) (denying summary judgment on basis of governmental immunity where issues of material fact existed as to whether police officers operated their emergency vehicle in disregard for safety of other persons in violation of established police policy); Hixson v. City of Hartford, No. 38110, 1991 WL 65916, at *1 (Conn. Super. Ct. Apr. 22, 1991) (holding that plaintiff may establish that police officer negligently performed a ministerial duty by violating police department policy and procedure). Because there are genuine issues of material fact regarding whether Maffeo violated a ministerial duty by using his Taser against Odom under the circumstances of this case, he is not entitled to summary judgment based on governmental immunity.

Moreover, even if all Maffeo's actions were found to be discretionary in nature, he still would not be entitled to summary judgment. In its earlier Memorandum of Decision, the Court declined to dismiss the negligence claims

asserted against Pendleton and Waterford on the basis that the identifiable person/imminent harm exception to governmental immunity might apply in this case. <u>Odom</u>, 2010 WL 466000, at *7. Specifically, the Court found that the plaintiff alleged that "her neurological condition rendered her more susceptible to injury from being Tasered and that Pendleton and the City of Waterford [sic] failed to train officers on the proper forbearance from the use of a Taser on individuals whom they knew had such conditions." <u>Id.</u> If these facts were established, the Court held, Odom may be able to satisfy the requirements of the identifiable person/imminent harm exception. Maffeo now argues that he is entitled to summary judgment on the First and Eleventh Counts because Odom has failed to produce evidence to support her claims that her brain injury rendered her more susceptible to injury from a Taser than any other person, and that she has failed to produce evidence that Maffeo was improperly trained.

However, in the cited portion of its earlier Memorandum of Decision, the Court was addressing Odom's allegations that Pendleton and Waterford were negligent in failing to properly train and supervise Maffeo in the use of a Taser. Maffeo was not a party to the motion to dismiss, and therefore the Court did not address Odom's allegations as to Maffeo. In his instant motion for summary judgment, Maffeo errs in assuming that the standard governing the liability of Pendleton and Waterford set forth by the Court in its earlier Memorandum of Decision applies to him as well. Maffeo had a role in the events giving rise to this case distinct from that of Pendleton and Waterford, and therefore the

governmental immunity analysis differs as to him. Odom did not bring suit against Maffeo for supervisory acts or failure to train, but rather for directly causing the alleged harm to her.

Connecticut courts have held that where, as here, an officer is alleged to have used excessive force against a person, he may be found to have subjected an identifiable person to imminent harm and therefore is not protected from suit by the doctrine of governmental immunity. See, e.g., Santana v. Rohan, No. CV040830569S, 2005 WL 1634310, at *5 (Conn. Super. Ct. June 7, 2005) (holding that suspect who was shot by police was an identifiable person subject to imminent harm for purposes of governmental immunity); Balogh v. City of Shelton, No. CV990067521S, 2002 WL 523225, at *8 (Conn. Super. Ct. Mar. 18, 2002) (denying summary judgment on the basis of governmental immunity where plaintiff offered sufficient evidence that her arrest without probable cause and with excessive force subjected her to harm that was significant, foreseeable, and of limited duration); Castorina v. Stewart, No. CV 950324487, 1998 WL 309393, at *6-7 (Conn. Super. Ct. June 3, 1998) (holding that person who was allegedly falsely arrest and assaulted by a police officer could be found by a jury to be an identifiable person subject to imminent harm). Accordingly, because there are genuine issues of material fact regarding whether Maffeo used excessive and unreasonable force against Odom, he is not entitled to governmental immunity as a matter of law, and the negligence claims asserted in the First and Eleventh Counts may proceed to trial.

### 4. Assault and Battery

Maffeo also seeks the entry of summary judgment in his favor on the intentional assault and battery claim asserted in the Third Count and the willful, wanton, and malicious assault and battery claim asserted against him in the Fifth Count. "To establish a claim for assault and battery, plaintiff must prove that defendants applied force or violence to her and that the application of force or violence was unlawful." Williams v. Lopes, 64 F. Supp. 2d 37, 47 (D. Conn. 1999). Maffeo's sole argument with respect to Odom's assault and battery claims is that his use of force against Odom was reasonable as a matter of law and therefore she cannot establish that the alleged harmful contact was unlawful. However, as discussed at length above, there are genuine issues of material fact regarding the reasonableness of Maffeo's use of force. See supra Section III.A.1. Therefore, summary judgment is denied as to the Third and Fifth Counts.

### 5. False Imprisonment

Finally, Maffeo argues that he is entitled to summary judgment on the Ninth Count, which asserts false imprisonment, because he had probable cause to arrest Odom for traffic infractions and for resisting arrest.

"False imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another." Green v. Donroe, 186 Conn. 265, 267 (1982). "To prevail on a claim of false imprisonment, the plaintiff must prove that [her] physical liberty has been restrained by the defendant and that the restraint was against [her] will, that is, that [she] did not consent to the restraint or acquiesce in

31

it willingly." <u>Berry v. Loiseau</u>, 223 Conn. 786, 820 (1992) (citation omitted).  A claim for false imprisonment cannot survive if the defendant can establish the existence of probable cause for the confinement.  <u>See</u> <u>Johnson v. Ford</u>, 496 F. Supp. 2d 209, 213 (D. Conn. 2007) ("It is well-established that probable cause is a complete defense to claims of false imprisonment and false arrest.").  Moreover, in order to defeat a claim for false imprisonment, it is not necessary for the defendant to show that probable cause existed as to each individual charge, or as to any charge actually invoked by the arresting officer.  <u>Jaegly v. Couch</u>, 439 F.3d 149, 154 (2d Cir. 2006).  Instead, a claim for false imprisonment will fail so long as the imprisonment itself was supported by probable cause, regardless of whether probable cause supported any charge actually identified by the arresting officer.  <u>Id.</u>

Maffeo contends that Odom's claim for false imprisonment fails as a matter of law because he had probable cause to arrest her for committing traffic infractions, namely Conn. Gen. Stat. § 14-242 (failure to signal) and Conn. Gen. Stat. § 14-218a (traveling unreasonably fast), as well as for failing to comply with his requests to provide her driver's license, registration, and proof of insurance in violation of Conn. Gen. Stat. § 14-217, which is also an infraction.  In response, Odom asserts that an arrest is not authorized for the commission of an infraction under Connecticut law.  The Connecticut General Statutes do not provide express guidance on the issue of whether a person may be arrested for an infraction, and there appears to be some ambiguity in the case law.  In <u>State v. Harrison</u>, 228

Conn. 758 (1994), the Connecticut Supreme Court held that police may pursue across town lines and arrest a person who is suspected of operating a motor vehicle under the influence of intoxicating liquor in accordance with Conn. Gen. Stat. § 54-1f.[4] In so holding, the Harrison Court rejected an argument that the penal code definition of "offense" codified in Conn. Gen. Stat. § 53a-24(a), which expressly excludes motor vehicle violations and infractions, should be applied in determining whether an arrest is authorized under Conn. Gen. Stat. § 54-1f. Id. at 762-63. Instead, the Court examined the legislative history and historical application of Conn. Gen. Stat. § 54-1f and determined that it may be applied to motor vehicle violations. Id. at 764-65. Notwithstanding the Harrison decision, however, the Connecticut Appellate Court, citing the Connecticut Practice Book, has stated that an arrest is not authorized in Connecticut for an infraction involving a motor vehicle. See State v. Dalzell, 96 Conn. App. 515, 527 n.11 (2006), reversed in part on other grounds, 282 Conn. 709 (2007) (citing Conn. Practice Book § 44-23(b)). These cases could be reconciled by interpreting Harrison as limited to its factual circumstances, which involved an arrest for driving under the

_____

[4] This statute provides, in pertinent part: "Peace officers . . . , in their respective precincts, shall arrest, without previous complaint and warrant, any person for any offense in their jurisdiction, when the person is taken or apprehended in the act or on the speedy information of others . . . . Members of any local police department . . . , when in immediate pursuit of one who may be arrested under the provisions of this section, are authorized to pursue the offender outside of their respective precincts into any part of the state in order to effect the arrest. . . ." Conn. Gen. Stat. § 54-1f(a), (c).

influence of intoxicating liquor pursuant to Conn. Gen. Stat. § 14-227a(a)(1), which is a motor vehicle violation and not an infraction.

The Court ultimately need not resolve this ambiguity, however, because Maffeo further argues that he had probable cause to arrest Odom for interfering with an officer in violation of Conn. Gen. Stat. § 53a-23 and Conn. Gen. Stat. § 53a-167a because she admittedly resisted his attempt to forcibly remove her from her vehicle. The former provision, Conn. Gen. Stat. § 53a-23, provides that a person is not justified in using physical force to resist an arrest by a reasonably identifiable police officer, regardless of whether the arrest is legal or illegal. It was intended to "change the common law rule . . . regarding the right to use force to resist an illegal arrest." State v. Privitera, 1 Conn. App. 709, 717-18 (1984). The latter provision, Conn. Gen. Stat. § 53a-167a, prohibits a person from interfering with an officer by obstructing, resisting, hindering, or endangering the officer in the performance of his duties. Violation of Conn. Gen. Stat. § 53a-167a is a class A misdemeanor, and therefore an arrest is clearly authorized for such an offense under Connecticut law. A person can violate Conn. Gen. Stat. § 53a-167a through passive resistance. See, e.g., Herpel v. Joyce, No. B:89-669(JAC), 1992 WL 336765, at *5 (D. Conn. Sept. 30, 1992); State v. Silano, No. CR020180647, 2003 WL 949856, at *1 (Conn. Super. Ct. Feb. 24, 2003).

Odom argues that Maffeo did not have probable cause to arrest her for violation of Conn. Gen. Stat. § 53a-167a because Maffeo's own affidavit avers that he told Odom she was under arrest even before he attempted to remove her from

her vehicle (Maffeo Aff. ¶ 20), at which point in time, she claims, he did not possess the authority to arrest her despite the fact that she had hindered Maffeo's investigation of alleged traffic infractions. However, the Connecticut Supreme Court has held that, based upon Conn. Gen. Stat. § 53a-23, the illegality of an arrest is not a defense to charges of interfering with an officer under Conn. Gen. Stat. § 53a-167a. State v. Davis, 261 Conn. 553, 567 (2002). The rationale for this rule was explained as follows:

> [T]hat the question of whether an *arrest* is legal or illegal (i.e. whether there is probable cause therefor) is usually a very difficult factual question; that the prior rule [allowing the use of force to resist an illegal arrest] invites violence; and that it is better social policy to require the arrestee to submit and challenge the arrest in court, rather than to permit him to use force at the place of arrest subject to a later judicial determination of the legality of the arrest.

Id. (quoting Privitera, 1 Conn. App. at 720). Therefore, Odom was not justified in resisting Maffeo's attempt to arrest her even assuming that the arrest was illegal.

Nevertheless, the Court concludes that there remain issues of material fact which render summary judgment on Odom's false imprisonment claim inappropriate. In Davis, the Connecticut Supreme Court made clear that, although a person may not resist an arrest even if the arrest is illegal, the person is not required to submit to the unlawful use of physical force by an officer during the course of the arrest because an officer using such force is not acting "in the performance of his duties." 261 Conn. at 572. "[W]hether a police officer reasonably believed that the use of physical force was necessary . . . and, therefore, was within the performance of his duties, is ultimately a factual

question to be determined by the jury, taking into account all of the circumstances of the case. . . ." Id.

The Court also noted that a person is not guilty of violating Conn. Gen. Stat. § 53a-167a if the officer was not reasonably identifiable as a police officer. Id. at 568-69. Here, there are disputed issues of material fact as to whether Maffeo used excessive force in attempting to arrest Odom. In addition, Odom has submitted evidence that Maffeo was not reasonably identifiable as a police officer because he had been driving erratically, his vehicle had yellow or white and orange flashing lights rather than red or blue lights typical of police cruisers, he shined a bright flashlight in her mirrors and then in her eyes when approaching her vehicle, and he failed to identify himself as a police officer. Therefore, whether there was probable cause to arrest Odom for interfering with an officer in violation of Conn. Gen. Stat. § 53a-167a is an issue best left for the jury to decide.

### 6. Summary

In summary, Maffeo's motion for summary judgment is DENIED in its entirety. The claims asserted against Maffeo for negligence (First Count), assault and battery (Third Count), willful/wanton assault and battery (Fifth Count), violation of 42 U.S.C. § 1983 (Seventh Count), false imprisonment (Ninth Count), and negligent infliction of emotional distress (Eleventh Count) shall proceed to trial.

**B. Pendleton and Waterford's Motion for Summary Judgment**

**1. Negligence**

Pendleton and Waterford first move for summary judgment as to the Thirteenth Count asserting negligent supervision and training. Pendleton and Waterford argue that they are entitled to summary judgment because Maffeo did not act negligently and therefore they cannot be held liable for failure to train or supervise him. However, the Court has already held that Odom has presented sufficient evidence for a reasonable jury to conclude that Maffeo's use of force was excessive and unreasonable. See supra Section III.A.1. Based upon the same evidence, the jury could also conclude that Maffeo acted negligently. Therefore, this argument is unavailing.

Nevertheless, the Court holds that Odom has failed to raise any genuine issue of material fact regarding her negligence claim against Pendleton and Waterford. The Amended Complaint alleges that Pendleton was negligent in that he adopted a policy which allowed Maffeo to carry and use a Taser that he was not properly trained to use, failed to supervise Maffeo's actions as they related to his carrying and use of a Taser, failed to adequately train Maffeo in determining a suspect's health condition before deploying a Taser, failed to ensure that Maffeo would only discharge a Taser in accordance with Connecticut and Town of Waterford policies and procedures, and failed to adopt proper policies regarding the use of Tasers. Odom has not proffered any evidence to support these allegations. Instead, in response to the factual assertions made by the

Defendants, Odom admits in her Local Rule 56(a)(2) Statements that she has no evidence regarding the nature or adequacy of Maffeo's training in particular or the training of Waterford Police Officers in general, and further admits that she has no evidence regarding the nature or adequacy of Waterford Police policies or procedures regarding the use of force in general or the use of Tasers specifically. See Pl. 56(a)(2) Statement, [Doc. #64-1], ¶¶ 23-24; Pl. 56(a)(2) Statement, [Doc. #65-1], ¶ 26. While the Waterford Police Department's policies regarding the use of force and use of "less lethal devices" have been entered in the record, Odom fails to articulate any manner in which these policies are improper or inadequate. Therefore, the conclusory, unsubstantiated allegations contained in the Amended Complaint are insufficient to permit a reasonable jury to find in Odom's favor on her negligence claim against Pendleton and Waterford. See Davis v. New York, 316 F.3d 93, 100 (2d Cir. 2002) ("[R]eliance upon conclusory statements or mere allegations is not sufficient to defeat a summary judgment motion."); Mays v. Woodruff, 142 Fed. Appx. 546, 547 (2d Cir. 2005) (the "bare allegations in [plaintiff's] complaint, alone, are not sufficient to withstand summary judgment").

Moreover, Odom has failed to raise a genuine issue of material fact regarding Pendleton and Waterford's entitlement to governmental immunity as to her negligence claim against them. The standards governing a municipal official's entitlement to governmental immunity are outlined above in Section III.A.3. The Connecticut legislature codified the tort liability of municipalities in Conn. Gen. Stat. § 52-557n, which in subsection (a)(1) thereof states that "[e]xcept as

otherwise provided by law, a political subdivision of the state shall be liable for damages to person or property caused by:  (A) The negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties . . ."  However, Section 52-557n extends the same discretionary act immunity that applies to municipal officials to the municipalities themselves.  Section 52-557n(a)(2)(B) states that municipalities will not be liable for "negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law."  Conn. Gen. Stat. § 52-577n(a)(2)(B).

As discussed previously in the context of Maffeo's motion for summary judgment, Pendleton and Waterford's entitlement to governmental immunity must be analyzed separately from that of Maffeo, because Maffeo is alleged to have directly caused harm to Odom while Pendleton and Waterford are alleged to be liable as a result of their negligent training and supervision.  See supra Section III.A.3.  With respect to the negligent training and supervision claim, the Court found in its Memorandum of Decision on Pendleton and Waterford's Motion to Dismiss that Odom may potentially fall within a foreseeable class of victims who are particularly susceptible to harm from being tasered as a result of a preexisting medical condition, thereby abrogating Pendleton and Waterford's entitlement to governmental immunity for discretionary acts.  Odom, 2010 WL 466000, at *7.  In so holding, however, the Court specifically noted that it "may well prove that the facts as developed through discovery challenge the Plaintiff's assertions" regarding her

particularized susceptibility to harm from being tasered and Pendleton and Waterford's failure to properly train Maffeo.  Id. at *7.

It is clear that the possibility recognized by the Court in its earlier Memorandum of Decision has come to fruition.  As an initial matter, Odom's memorandum in opposition to Pendleton and Waterford's motion for summary judgment entirely ignores and fails to address their argument that they are entitled to governmental immunity.  Likewise, Odom's Local Rule 56(a)1 Statement admits all twenty-seven statements of material fact contained in Pendleton and Waterford's Local Rule 56(a)1 Statement, and does not identify any disputed issues of fact regarding her brain injury or the training of Waterford police officers.  See [Doc. #65-1].  Nor are there any particularized facts in the record which would rebut the Defendants' factual assertions.  Therefore, Odom has essentially conceded that governmental immunity bars her negligence claim against Pendleton and Waterford.  See, e.g., Di Giovanna v. Beth Isr. Med. Ctr., No. 09-CV-2750, 2009 WL 2870880, at *10 n.108 (S.D.N.Y. Sept. 8, 2009) (deeming claim abandoned where plaintiff failed to make any attempt to rebut defendants' motion for summary judgment as to this claim); Paulk v. Lester, , No. 5:06-CV-1343, 2010 WL 2560559, at *5 (N.D.N.Y. June 22, 2010) (noting that, where plaintiff failed to respond to argument made in defendants' summary judgment motion, plaintiff is deemed to consent to argument and therefore defendants must meet only a lightened burden of showing that their request for dismissal has facial merit).

Furthermore, while the evidence in the record shows that Odom suffered a brain injury in an automobile accident on June 6, 2004, there is no evidence that Odom's brain injury rendered her particularly susceptible to harm from being tasered. Following her accident, Odom was diagnosed with concussion, mild traumatic brain injury, and excessive sleepiness. However, there is no medical evidence that Odom suffers from photosensitivity or seizure activity, as she alleges in her Amended Complaint. To the contrary, Odom now admits in her Local Rule 56(a)(2) Statement that there is no competent evidence that she ever suffered from seizures prior to the events giving rise to this case. Pl. Rule 56(a)(2) Statement, [Doc. #58-2], ¶ 20. Odom has not disclosed a medical expert to testify about her medical diagnoses and the nature or effect of her injury. Nor has Odom presented any medical records establishing that the Taser shocks administered by Maffeo caused her any substantial harm or exacerbated her preexisting brain injury. See Collette v. Collette, 177 Conn. 465, 471 (1979) (finding that it was error to permit lay witness to testify regarding the cause of an injury because "evidence of . . . the medical effect upon the human system of the infliction of injuries, is generally not within the sphere of the common knowledge of a lay witness . . ."); see also LePage v. Horne, 262 Conn. 116, 125 (2002) ("Expert testimony is required when the question involved goes beyond the field of ordinary knowledge and experiences of judges or jurors."); Montagnon v. Pfizer, 584 F. Supp. 2d 459, 463-64 (D. Conn. 2008) (granting summary judgment for defendant because plaintiff failed to proffer expert medical evidence). Similarly, Odom has failed to disclose

an expert witness to testify about or present any evidence regarding the training of Waterford police officers in general or Maffeo in particular.  Therefore, Odom has not raised a genuine issue of material fact as to whether she falls within a foreseeable class of victims for purposes of her negligence claim against Pendleton and Waterford, and Pendleton and Waterford are entitled to governmental immunity with respect to the Thirteenth Count.

## 2.  Violation of 42 U.S.C. § 1983

Next, Pendleton and Waterford argue that they are entitled to summary judgment on the Fifteenth Count, which alleges violation of 42 U.S.C. § 1983.  They contend that summary judgment is appropriate because Odom has failed to demonstrate that the alleged failure to train or supervise Maffeo amounted to deliberate indifference, and because Pendleton was not personally involved in the alleged constitutional deprivation.

The United States Supreme Court has held that a municipality cannot be held liable on a *respondeat superior* theory.  Monell v. Dep't of Social Services, 436 U.S. 658, 691 (1978).  The Monell Court held that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is liable under § 1983."  Id. at 694.  Thus, to hold a municipality liable under 42 U.S.C. § 1983, a plaintiff must prove that the asserted violation of a federally protected right was

caused by a municipal policy, a municipal custom or practice, or the decision of a municipal policymaker with final policymaking authority.  City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988).  A plaintiff must further demonstrate that, "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged."  Board of County Commissioners v. Brown, 520 U.S. 397, 404 (1997) (emphasis in original).  "That is, a plaintiff must show that the municipal action was taken with the requisite culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  Id.

In her Amended Complaint, Odom alleges that Pendleton "adopted policies regarding the use of force by police officers and the use of Taser guns which he knew would increase the level of police violence in Waterford and said policies were maintained and continued with force despite this knowledge."  [Doc. #23-2 ¶ 29].  Odom further alleges that Waterford is liable under 42 U.S.C. § 1983 because Pendleton adopted such policies in his capacity as a decision-maker with final policymaking authority.  Id. ¶ 32.  As discussed previously, the Waterford Police Department does have policies regarding the "Use of Force" in general and the use of "less lethal devices" in particular, which includes Tasers.  These policies are consistent with the requirements of Connecticut statutory law, and Odom has not argued that they are unconstitutional as written.  Nor has she offered any evidence to demonstrate that the policies as written were the "moving force" behind the violation of her constitutional rights by Maffeo.  To the contrary, as discussed above, there is substantial evidence that Maffeo did not comply with the

policies by using force to effect an arrest of a person suspected of committing only minor infractions, and by employing a Taser both without warning and on a person engaged in passive resistance.  See supra Section III.A.1.  Therefore, Waterford cannot be held liable under 42 U.S.C. § 1983 for expressly adopting an unconstitutional policy.

This does not end the inquiry, however, because municipality liability does not attach only where the official policy at issue is itself unconstitutional.  See Amnesty America v. Town of West Hartford, 361 F.3d 113, 126 (2d Cir. 2004).  "Where a city's official policy is constitutional, but the city causes its employees to apply it unconstitutionally, such that the unconstitutional application might itself be considered municipal policy, the city may be held liable for its employees' unconstitutional acts."  Id.  Where, as here, a subordinate municipal official is alleged to have committed the constitutional violation, the plaintiff must establish that the subordinate's conduct is attributable to the acts or omissions of officials with final policymaking authority.  Id. at 126.  "Thus, where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence may 'be properly thought of as a city policy or custom that is actionable under § 1983."  Id. (quoting City of Canton v. Harris, 489 U.S. 378, 387 (1989).

In this case, Odom has asserted that municipal liability may lie because Maffeo was not properly trained in the use of a Taser.  Inadequate training can be a

basis for municipal liability "in limited circumstances." City of Canton, 489 U.S. at 387. "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." Id. at 389. "[M]unicipal liability under § 1983 attaches where - and only where - a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Pembauer, 475 U.S. at 483-84.

"In order to establish that a failure to train constitutes deliberate indifference to the constitutional rights of the public, a plaintiff must establish (1) that the policymaker knows 'to a moral certainty' that his employees will confront a given situation; (2) that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or there is a history of employees mishandling the situation; and finally (3) that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." Wilson v. City of Norwich, 507 F. Supp. 2d 199, 210 (D. Conn. 2007) (citing Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir. 1992)).

In addition to establishing that the purported failure to train occurred under circumstances that could constitute deliberate indifference, City of Canton requires that the plaintiff also identify a specific deficiency in the city's training program and establish that the deficiency is "closely related to the ultimate injury,"

such that it "actually caused" the constitutional violation. 489 U.S. at 391. Thus, a plaintiff must establish that "the officer's shortcomings . . . resulted from . . . a faulty training program" rather than from the negligent administration of a sound program or other unrelated circumstances. Id. at 390-91. Further, it is not sufficient to show that only a particular officer is unsatisfactorily trained, because "the officer's shortcomings may have resulted from factors other than a faulty training program." Id. at 391-92.

Here, Odom has proffered no evidence regarding Waterford's training program for police officers in general or Maffeo's training in particular, nor has she advanced any theory as to how a training deficiency caused Maffeo to use excessive force against her. Instead, Odom's failure to train theory appears to be based solely on evidence that Maffeo attempted to forcibly remove her from her vehicle and then tasered her three times without warning. However, as a matter of law, this is insufficient to support municipal liability. As the Second Circuit has explained, "City of Canton unequivocally requires . . . that the factfinder's inferences of inadequate training and causation be based on more than the mere fact that misconduct occurred in the first place." Amnesty America, 361 F.3d at 130. Odom cannot prevail on her claim that Waterford's training program was inadequate without any evidence as to whether Waterford trained Maffeo, how the training was conducted, how better or different training could have prevented the conduct she complains of, or how "a hypothetically well-trained officer would have acted under the circumstances." Id. (quoting City of Canton, 489 U.S. at 391).

Odom also argues that municipal liability attaches because Pendleton failed to adequately supervise Maffeo.  The Second Circuit has held that a plaintiff injured by a police officer's use of excessive force may establish a basis for municipal liability by showing that the municipality's policymakers were "knowingly and deliberate indifferent to the possibility that its police officers were wont" to violate the constitutional rights of arrestees.  Flacco v. City of Rensselaer, 783 F.2d 319, 326-27 (2d Cir. 1986).  In this context, Odom must demonstrate Pendleton's deliberate indifference by showing that "the need for more or better supervision to protect against constitutional violations was obvious," but that Pendleton made "no meaningful attempt" to forestall or prevent  the unconstitutional conduct.  Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995).  An obvious need may be shown through proof of repeated complaints of civil rights violations that are followed by no meaningful attempt to investigate or forestall further incidents on the part of the municipality, or through expert testimony that a particular practice condoned by the municipality presented an unusually high risk that constitutional rights would be violated.  Id.

Odom further contends that Pendleton is personally liable for failing to supervise Maffeo.  Supervisory liability is a concept distinct from municipal liability, and is "imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates."  Clay v. Conlee, 815 F.2d 1164, 1170 (8th Cir. 1987).  "It is well-settled in this Circuit that personal involvement of defendants in alleged

constitutional deprivations is a prerequisite to an award of damages under §

1983." Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citation and quotation

marks omitted). "The personal involvement of a supervisory defendant may be

shown by evidence that: (1) the defendant participated directly in the alleged

constitutional violation, (2) the defendant, after being informed of the violation

through a report or appeal, failed to remedy the wrong, (3) the defendant created a

policy or custom under which unconstitutional practices occurred, or allowed

continuance of such a policy or custom, (4) the defendant was grossly negligent in

supervising subordinates who committed the wrongful acts, or (5) the defendant

exhibited deliberate indifference to the rights of [others] by failing to act on

information indicating that unconstitutional acts were occurring." Colon v.

Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).

The only evidence Odom proffers in support of her failure to supervise

theory is a newspaper article describing a prior incident in which Maffeo used

excessive force against a suspect during a traffic stop. [Doc. #65-3]. The article,

published in The Day on July 7, 2006, reported that Maffeo pulled a gun on a man

named Kiribaka Tucker after a pursuit at speeds of 35 miles per hour. Id. Tucker

drove away from the scene after Maffeo pulled the gun on him. Id. Maffeo

received a written reprimand signed by Pendleton as a result of the incident. Id.

Pendleton was quoted in the article as stating that Maffeo's actions were

unwarranted and violated the Waterford Police Department's Use of Force policy.

Id. Maffeo filed a grievance regarding the reprimand, which was denied by the

Police Commission.  Id.  Odom argues that, based upon evidence of this prior similar incident involving Maffeo, which occurred less than five months before the events giving rise to the instant action, a reasonable jury could conclude that Pendleton failed to properly train and supervise Maffeo.

Odom's argument is unavailing.  As an initial matter, newspaper articles offered for the truth of the matters asserted therein are inadmissible hearsay that may not be considered by the Court in deciding a motion for summary judgment. See Allen v. City of New York, 480 F. Supp. 2d 689, 720 (S.D.N.Y. 2007) (finding that newspaper article reporting that inmates at Rikers Island had been routinely beaten and that correctional officers had taken steps to conceal these assaults was inadmissible hearsay and could not be used to demonstrate an unconstitutional policy, custom, or practice); Gonzalez v. City of New York, 354 F. Supp. 2d 327, 347 n.29 (S.D.N.Y. 2005) (finding newspaper articles offered in support of plaintiffs' pattern and practice claims to be "inadmissible hearsay and unusable to defeat summary judgment"); United States v. Difeaux, 163 F.3d 725, 729 (2d Cir. 1998) (holding that newspaper articles alleging improper motivations of prosecutor's office were impermissible hearsay).

Even were the Court to consider the newspaper article, however, it does not support a claim that Pendleton was deliberately indifferent to or otherwise personally involved in the violation of Odom's constitutional rights.  The incident recounted in the newspaper article did not involve Maffeo's use of a Taser on a person with a medical condition, which is the crux of Odom's allegations in the

**49**

instant case.  Also, contrary to Odom's contentions, Pendleton took appropriate action in response to Maffeo's excessive use of force during that earlier incident. Following the incident, the Waterford Police Department investigated the relevant facts and circumstances.  Pendleton Aff. ¶ 5.  Pendleton gave Maffeo a written reprimand, and Maffeo was also required to participate in additional police training on the Department's Pursuit Driving policy and Use of Force policy.  Id. ¶¶ 6-8. These facts contradict Odom's conclusory allegations of deliberate indifference. See Zahara v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995) (affirming dismissal of 42 U.S.C. § 1983 claim against town because evidence showed that town investigated plaintiff's allegations of unconstitutional conduct by town employees, notwithstanding plaintiff's unsupported assertion that the town's efforts were disingenuous); Liebe v. Norton, 157 F.3d 574, 578 (8th Cir. 1998) (holding that defendant did not act with deliberate indifference to inmate who committed suicide after being classified as a suicide risk because defendant took affirmative steps to prevent the suicide).  Since Odom has proffered no evidence other than the aforementioned newspaper article, her 42 U.S.C. § 1983 claim against Pendleton and Waterford cannot survive summary judgment.  See Dockery v. Tucker, No. 97-CV-3584(ARR), 2006 WL 5893295, at *23-24 (E.D.N.Y. Sept. 6, 2006) (granting summary judgment on Monell claims where plaintiff relied upon newspaper articles and judicial decisions to support allegations of a pattern of police misconduct because such evidence served only to establish that allegations

had been made and did not permit a conclusion as to the extent of any investigation or disciplinary actions taken by the municipality in response).

Finally, Odom contends that she cannot adequately respond to the Defendants' arguments regarding municipal and supervisory liability because the Defendants did not provide her with certain material during discovery, including the Waterford Police Department's directives manual and Maffeo's training file. She therefore requests that the Court continue or deny Pendleton and Waterford's motion for summary judgment pursuant to Fed. R. Civ. P. 56(f). However, the Plaintiff has failed to file an affidavit as required by Fed. R. Civ. P. 56(f) describing "(1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful." Gualandi v. Adams, 385 F.3d 236, 244 (2d Cir. 2004). Therefore, Odom has not demonstrated her entitlement to additional discovery under Fed. R. Civ. P. 56(f).

Moreover, Odom has not satisfied the standard for modifying a scheduling order pursuant to Fed. R. Civ. P. 16, as she would need to do in order to obtain discovery after expiration of the discovery deadline as she requests. That rule provides that a scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "'Good cause' requires a greater showing than 'excusable neglect.' At a minimum, good cause requires a showing by the moving party of an objectively sufficient reason for extending a deadline

such that the deadlines cannot reasonably be met despite the diligence of the party needing the extension. The inquiry focuses on the moving party's reason for requesting the extension." Pyke v. Cuomo, No. 92CV554(NPM/DRH), 2004 WL 1083244, at *2 (N.D.N.Y. May 12, 2004) (internal citations omitted). The Second Circuit has emphasized that "the primary consideration" in determining whether good cause has been shown "is whether the moving party can demonstrate diligence." Kassner v. 2nd Avenue Delicatessen Inc., 496 F.3d 229, 244 (2d Cir. 2007).

As the record of this case reflects, Odom was continually represented by counsel in this matter and had more than one year to conduct discovery. This action was filed on September 18, 2008, and was removed to this Court on October 14, 2008. [Doc. #1]. Attorney Bush and his colleague Attorney Taalman each filed a notice of appearance on behalf of Odom on October 10, 2008. [Doc. ##9, 10]. On November 26, 2008, the Court entered a scheduling order setting a discovery deadline of September 15, 2009 as proposed by the parties in their Fed. R. Civ. P 26(f) Report. [Doc. #13]. Attorney McNamara filed a notice of appearance on behalf of Odom on February 18, 2009. [Doc. #25]. Attorney McNamara's notice indicated that his appearance was in addition to the appearance of other counsel of record for Odom, and Attorney Bush did not file a motion to withdraw as counsel in this matter until January 17, 2011, approximately two weeks before jury selection. [Doc. #79]. Attorney Taalman has never filed a motion to withdraw.

On July 17, 2009, the Court granted Maffeo's motion to extend the discovery deadline until November 2, 2009. [Doc. #37]. Discovery in this matter therefore expired on November 2, 2009, without motion for a further extension by either party. Thereafter, on December 12, 2010, Attorney Bush filed a motion on behalf of Odom seeking an extension of the dispositive motions deadline, which at the time was set for December 21, 2009. [Doc. #50]. In the motion, Attorney Bush explained that Attorney McNamara, who had been serving as lead counsel for Odom, had unexpectedly passed away, and that an extension of time was needed to arrange for Odom to retain new lead counsel and arrange the appropriate transfer of files from Attorney McNamara's office as well as to provide the parties with an opportunity to complete Odom's deposition. Id. The motion further indicated that Attorney Bush's firm had no active involvement in the case, including discovery, and had maintained an appearance "for notice purposes only." Id. The Court granted the motion on January 14, 2010 and extended the dispositive motions deadline until March 22, 2010. [Doc. #51]. However, the Court's order explicitly advised Attorney Bush that permission to appear in a limited noticing capacity had neither been sought nor granted. Id.

Subsequently, on February 16, 2010, Attorney Ankrom filed a notice of appearance on behalf of Odom. [Doc. #53]. Two days later, on February 28, 2010, Attorney Ankrom filed a motion for extension of time to file dispositive motions on the basis that he needed additional time to review the case materials obtained from Attorney McNamara's office. [Doc. #54]. The motion further indicated that the

parties had agreed to continue Odom's deposition until early April to afford Attorney Ankrom adequate time to prepare, but it made no mention of any other outstanding discovery matters. Id. The Court granted the motion on February 22, 2010, and extended the dispositive motions deadline until May 6, 2010 as requested. [Doc. #56]. The Defendants filed their respective motions for summary judgment on May 4, 2010. [Doc. ##57, 58]. On May 17, 2010, Odom moved to extend the deadline for filing a response to the motions for summary judgment, arguing, for the first time, that the Defendants had refused to comply with belated discovery requests made by Attorney Ankrom after expiration of the discovery deadline. [Doc. #60]. The motion invoked Attorney McNamara's unexpected passing as a reason for Odom's attempt to seek discovery months after expiration of the discovery deadline, but did not state why Attorney Bush did not pursue production or invoke the Court to resolve a discovery dispute. Id. The Court notes that under its Chambers Practices, which are electronically served on the parties and are also available on the District of Connecticut's website, the Court makes itself available every Friday afternoon for telephonic discovery dispute resolution. See http://www.ctd.uscourts.gov/vlb.html. By order dated May 21, 2010, the Court denied the motion, explaining that an additional extension of time to permit Odom to conduct discovery such a late juncture was not warranted in light of the fact that Odom was continually represented by Attorney Bush throughout this litigation and that permission to appear in a limited noticing capacity was neither sought by Attorney Bush nor granted by the Court. [Doc. #63]. The order further noted that

the Court had taken the delay caused by Attorney McNamara's passing into account by granting a sixty extension of the dispositive motions deadline as previously requested by Odom.  Id.

Based upon the foregoing case history, it is clear that Odom has not satisfied the "good cause" standard and is therefore not entitled to additional discovery in order to oppose the instant motions for summary judgment.  Odom was allowed until November 2, 2009 to conduct discovery in this matter, more than one year after the case was filed.  During that entire period, she was represented both by Attorney McNamara as well as by Attorney Bush and Attorney Taalman, yet the materials that she now seeks from the Defendants were never requested. Following Attorney McNamara's unfortunate passing, the Court granted two extensions of the dispositive motions deadline to enable Odom to obtain new lead counsel and to afford that counsel, Attorney Ankrom, additional time to review the discovery materials that had been compiled by Attorney McNamara and to prepare for Odom's deposition.  Nevertheless, at no point prior to the filing of the instant motions for summary judgment did Attorney Bush, Attorney Taalman, or Attorney Ankrom advise the Court of any outstanding discovery matters apart from the parties' agreement to extend Odom's deposition.  Instead, Attorney Ankrom first raised the issue of the additional discovery requests in his motion for extension of time to respond to the summary judgment motions filed on May 17, 2010, more than six months after expiration of the discovery deadline.  Therefore, the Court

finds that Odom has not demonstrated "good cause" to reopen discovery at this late stage of the litigation.

Accordingly, Odom has failed to raise any genuine issue of material fact with respect to Pendleton and Waterford's liability under 42 U.S.C. § 1983, and Pendleton and Waterford are entitled to summary judgment on the Fifteenth Count.

### 3. Indemnification

Finally, Waterford seeks the entry of summary judgment in its favor on the Second, Fourth, Sixth, Eighth, Tenth, Twelve, Fourteenth, and Sixteenth Counts, each of which seeks indemnification for the acts of the individual defendants, Pendleton and Maffeo, pursuant to Connecticut General Statutes § 7-465. This provision reads, in pertinent part:

> Any town, city or borough . . . shall pay on behalf of any employee of such municipality . . . all sums which such employee becomes obligated to pay by reason of the liability imposed upon such employee by law for damages awarded for infringement of any person's civil rights or for physical damages to person or property . . . if the employee, at the time of the occurrence, accident, physical injury or damages complained of, was acting in the performance of his duties and within the scope of his employment, and if such occurrence, accident, physical injury or damage was not the result of any willful or wanton act of such employee in the discharge of such duty . . . .

Conn. Gen. Stat. § 7-465.

"Section 7-465 is an indemnity statute; it does not create liability. Under Section 7-465, the municipality's duty to indemnify attaches only when the employee is found to be liable and the employee's actions do not fall within the exception for willful and wanton acts." Myers v. City of Hartford, 84 Conn. App. 395, 400 (2004). Section 7-465 imposes no liability upon a municipality for breach

of any statutory duty of its own.  Ahern v. New Haven, 190 Conn. 77, 82 (1983).

"The obligation imposed is indemnification for the legal liability arising out of

certain tortious conduct of the municipal employee," and "[t]he municipality's

liability is derivative."  Id.   "A plaintiff bringing suit under General Statutes § 7-465

first must allege in a separate count and prove the employee's duty to the

individual injured and the breach thereof.  Only then may the plaintiff go on to

allege and prove the municipality's liability by indemnification."  Sestiso v. City of

Groton, 178 Conn. 520, 527 (1979).

The Court has denied Maffeo's motion for summary judgment in its entirety.

Therefore, genuine issues of material fact remain regarding Odom's claims against

Waterford for indemnification for Maffeo's alleged torts under Connecticut General

Statute § 7-465 (Second, Fourth, Sixth, Eighth, Tenth, and Twelfth Counts).

However, since the Court has granted summary judgment as to both of Odom's

claims against Pendleton, Waterford is entitled to summary judgment on the

indemnification claims asserted in the Fourteenth and Sixteenth Counts, which

seek indemnification for Pendleton's alleged torts.

### 4.  Summary

In summary, Pendleton and Waterford's motion for summary judgment is

GRANTED IN PART and DENIED IN PART.  The claims asserted against Pendleton

and Waterford for negligent training and supervision (Thirteenth Count) and

violation of 42 U.S.C. § 1983 (Fifteenth Count), and the claims asserted against

Waterford for indemnification pursuant to Connecticut General Statute § 7-465 for

Pendleton's alleged torts (Fourteenth and Sixteenth Counts), are dismissed.

However, the claims asserted against Waterford for indemnification pursuant to

Connecticut General Statute § 7-465 for Maffeo's alleged torts (Second, Fourth,

Sixth, Eighth, Tenth, and Twelfth Counts) shall proceed to trial.

## III.  CONCLUSION

Based upon the foregoing reasoning, defendant Maffeo's motion for

summary judgment is DENIED, and defendants Pendleton and Waterford's motion

for summary judgment is GRANTED IN PART and DENIED IN PART as stated

above.  This case will proceed to trial on the surviving claims asserted in the

Amended Complaint as set forth in the Court's Scheduling Order dated December

14, 2010.  [Doc. #68].

IT IS SO ORDERED.

_____/s/_____
Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut:  January 24, 2011.